Filed 4/2/21  P. v. Godbolt CA2/2
Review denied 6/30/21; reposted with Supreme Court order and statement

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>JAYLIN GODBOLT et al.,<br><br>     Defendants and Appellants. | B302235<br><br>(Los Angeles County<br> Super. Ct. No. KA116437)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br>[CHANGE IN JUDGMENT] |

THE COURT:

The opinion filed herein on March 12, 2021, is modified as follows:

The DISPOSITION at pages 58–59 is deleted in its entirety.  The following DISPOSITION is inserted in its place:

## DISPOSITION

Appellants' convictions for the attempted murder of Manuel Jose Jimenez are reversed. Appellants' cases are remanded with directions to enter new sentences that reflect the reversal of the convictions for the attempted murder of Manuel Jose Jimenez and the striking of the associated enhancements. With respect to each appellant, the sentence is to be reduced by a term of 40 years to life imprisonment, comprised of 15 years for the offense and 25 years for the enhancement under Penal Code section 12022.53, subdivision (d), resulting in the following new sentences: Godbolt for a term of 230 years to life; Ray for a term of 230 years to life; and Wise for a term of 170 years to life.

The judgment as to Godbolt is to be corrected to provide for a court security fee of $930 under Penal Code section 1465.8 and a criminal conviction assessment of $1,240 under Government Code section 70373.

The superior court is directed to correct the abstracts of judgment as follows:

(1) In Godbolt's abstract, the number of determinate years is to be reduced from 252 to 250 (abstract, p. 1, para. 6) and the sentence is to be reduced by 40 years to reflect the reversal of the conviction for the attempted murder of Manuel Jose Jimenez; also in Godbolt's abstract, in all but the 25 robbery counts, the convictions must be shown to be based on convictions by a jury instead of being based on pleas.

(2) In Ray's abstract, in all but the 28 robbery counts, the convictions must be shown to be based on convictions by a jury instead of being based on pleas; and the sentence is to be reduced by 40 years to reflect the reversal of the conviction for the attempted murder of Manuel Jose Jimenez.

2

(3) In Wise's abstract, the sentence is to be reduced by 40 years to reflect the reversal of the conviction for the attempted murder of Manuel Jose Jimenez.

The superior court shall issue new abstracts of judgment that correct the errors noted and that reflect the new sentences imposed on appellants. The court shall forward the new abstracts of judgment to the Department of Corrections and Rehabilitation.

In all other respects, the judgments are affirmed.

This modification changes the judgment.

The petition for rehearing filed March 18, 2021, is denied.

_____

LUI, P. J.          CHAVEZ, J.        HOFFSTADT, J.

Filed 3/12/21  P. v. Godbolt CA2/2 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B302235 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA116437) |
| v. | |
| JAYLIN GODBOLT et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Steven D. Blades, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant Jaylin Godbolt.

Patricia Ihara, under appointment by the Court of Appeal, for Defendant and Appellant Sean Ray.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant Branden M. Wise.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill, and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————————

Jaylin Godbolt (Godbolt), Sean Ray (Ray), and Branden Wise (Wise), collectively referred to as appellants, were jointly tried before a jury which found them guilty of first degree murder, four attempted murders, and of shooting at an inhabited building.  Godbolt and Ray appeal from judgments imposing on each of them terms of imprisonment of 270 years to life and Wise appeals from a judgment and sentence of 210 years to life imprisonment.

We reject appellants' contention that their jailhouse statements admitting these charges should have been excluded.  We conclude that one of the attempted murder convictions must be reversed because it is not supported by any evidence.  We find that errors in the abstracts of judgment must be corrected.  We remand the cases with directions to enter new sentences that exclude the convictions for one of the attempted murders, to correct the errors in the abstracts of judgment that are noted in our opinion, and to issue new abstracts of judgment reflecting these changes.  Otherwise, we affirm the judgments.

Prior to the trial which resulted in this appeal, Godbolt pleaded no contest to 25 counts of robbery and he admitted gang

(Pen. Code, § 186.22(b)(1)(C)),[1] firearm (§§ 12022.53(b)(e)(1), 12022(a)(1)), and "on-bail"[2] enhancements. The pleas were in exchange for the agreed upon disposition of a sentence of 20 years and included a waiver of appellate rights as to these robbery charges.

Also prior to trial, Ray pleaded nolo contendere to 28 counts of robbery and 2 counts of possessing a firearm in a vehicle. He admitted the gang, firearm, and "on-bail" enhancements. As with Godbolt, the agreed upon disposition was a determinate sentence of 20 years and a waiver of appellate rights as to these charges.

## THE VERDICTS AND THE SENTENCES

All three appellants were found guilty of the first degree murder of Florencio Ramirez. Gang enhancements and multiple firearm enhancements were found to be true of these crimes. Appellants were also found guilty of the attempted murders of Nancy Orozco, Stephanie Gastelo, Maria Alvarez, and Manuel Jose Jimenez. Each of these attempted murders were found to be willful, deliberate, and premeditated. Gang enhancements and multiple firearm enhancements were found to be true as to each of these four crimes. Godbolt and Ray were found guilty of shooting at an inhabited building and once again gang enhancements and several firearm enhancements were found to be true. Godbolt admitted "on-bail" enhancements as to all of these crimes.

---

[1] Statutory references are to the Penal Code unless otherwise noted.

[2] This enhancement is based on the fact that at the time of the commission of the offense, the defendant had been released from custody on his own recognizance or on bail. (§ 12022.1.)

Godbolt was sentenced to a total term of 270 years to life. This was composed of 25 years to life for the first degree murder, five times 15 years to life for the attempted murders and shooting at an inhabited building, and six times 25 years to life for the enhancement under section 12022.53(d),[3] for a total of 250 years to life.[4] Twenty years for the robberies was added under the terms of the plea agreement.

Ray was sentenced to a total term of 270 years to life. The composition of this sentence was the same as Godbolt's.[5]

Wise was sentenced to a term of 210 years to life. His sentence was composed of 25 years to life for first degree murder, four times 15 years to life for the attempted murders and 125 years to life for the five firearm enhancements.

We address the specific fines and fees imposed in discussing the contentions advanced regarding these fines.

The appeals are from the judgments.

## THE FACTS

We summarize the facts of the counts that went to trial.

---

[3] This enhancement is for personally and intentionally discharging firearm proximately causing great bodily injury. (§ 12022.53(d).)

[4] Godbolt's abstract of judgment erroneously states that 252 years were imposed on the counts that went to trial. The abstract of judgment is also in error in recording that all of Godbolt's convictions were based on pleas. These errors will have to be corrected.

[5] The abstract of Ray's judgment also needs to be corrected in that it shows the convictions to be based on pleas.

4

### 1. *The Shootings*

The fusillade of gunfire that killed Florencio Ramirez and nearly produced four more murders took place against the backdrop of long-standing hostile tensions between the 76 East Coast Crips[6] gang and the Florencia 13, a Hispanic gang, on turf that was disputed between these two warring factions. Appellants were members of the East Coast Crips, the 76 East Coast Crips being a subset neighborhood gang of the East Coast Crips.

The shootings took place on August 19, 2017, shortly after midnight on 77th Street near Parmelee Avenue. A group of five on four bikes was proceeding south on Parmelee and turned on 77th Street. They had been at the home of Nancy Orozco (Orozco) and Florencio Ramirez (Ramirez) and were on their way to another friend's house. Orozco and Ramirez were on one bike. They were in the lead, followed by Manuel Jose Jimenez (Jimenez), Maria Alvarez (Alvarez), and Stephanie Gastelo (Gastelo). After a short exchange with a person in a white Cherokee, Gastelo saw a black Honda[7] with its bottom lights lit on 77th Street. As Gastelo looked back, she saw the person in the left back come out of the Honda halfway and start shooting. The shots were aimed at Gastelo. She jumped off her bike after the first five shots and got between two cars; she felt she had been hit. The Honda moved up and got closer to Gastelo and two more shots were fired. Gastelo was hit in her buttocks and two more shots skinned her left elbow and left rib cage.

---

[6] This refers to East Los Angeles.

[7] The Honda was a stolen vehicle.

Alvarez saw three people in the Honda shooting. They were the driver, the rear passenger and the front passenger who was firing out the window and over the hood of the car. They were shooting in Gastelo's and Alvarez's direction.[8] Alvarez saw Jimenez run off on foot. Once the shooters stopped firing at Gastelo, they started shooting at Ramirez and Orozco who were trying to get behind a car. The Honda started to back up and Alvarez remembered thinking, "Oh, my God, we're dead. We're dead."

Orozco heard four or five shots and then Gastelo was yelling that they were shooting. Orozco was shot in her left buttock and she and Ramirez fell off the bike. Ramirez said he had been shot and he appeared to be in pain. Ramirez died as a result of a single gunshot that entered his back. He had "F13" tattooed on his body and was a member of the Florencia 13 gang.

### 2. A prior altercation

On August 8, 2017, two deputy sheriffs responded to a call reporting an illegal shooting on Parmelee Avenue. The deputies found two .9-millimeter casings, two .40-millimeter casings, and a live .40-caliber round on the scene.

An Instagram posting by Ray on August 9, 2017, states that his car got shot up by the Florencia gang. Ray was arrested on August 13, 2017, for a traffic violation and was found to be in possession of a .9-millimeter Taurus pistol. The casings found on August 8, 2017, were found to have been fired by this pistol. Other casings found on August 8, 2017, were found to have been fired by a gun in the possession of a Florencia 13 gang member.

---

[8] "It all happened so fast. It felt like the 4th of July that night." (Alvarez testifying.)

6

### 3. Ray is arrested in possession of a weapon used in the shootings

Among other objects, four .9-millimeter casings were found on the scene of the shootings by a forensic identification specialist.

Ray was arrested on August 19, 2017, when he was spotted standing by the stolen Honda. A .9-millimeter gun was found in the car. The four .9-millimeter casings recovered from the scene of the shooting were fired from this gun.

### 4. The investigation

Detective Dean Camarillo (Camarillo) of the Los Angeles County Sheriff's Department was assigned to investigate Ramirez's murder. Camarillo arrived at the scene of the shootings in the early morning hours of August 19, 2017, and oversaw the collection of evidence.

Camarillo had considerable experience with gangs and particularly with the Florencia 13 gang. He was also familiar with the 76 East Coast Crips. Over time, he became aware of the August 8, 2017 shooting involving Ray and a Florencia 13 gang member. He learned that Ray and Wise lived near each other, close to the site of the shootings, and that there was a connection between the two men. He also learned that Wise was in county jail. He decided to proceed with what he called a "*Perkins* operation" with Wise.[9]

---

[9] We discuss *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins)* below. Camarillo and the parties to this appeal understand a "Perkins operation" to involve placing an informant in a jail cell with the target defendant.

7

Camarillo listened to a telephone call made by Godbolt from the jail to a female on July 27, 2018. In the call, Godbolt stated that the "CRIP"—meaning the informant—got him.

### 5. *Wise's jailhouse statement*[10]

Wise's questioning was conducted on January 8, 2018, at the downtown county jail facility in Los Angeles. [11]

Camarillo testified that he gave the confidential informant, who was placed in the cell with Wise, "very little" information. This was because he did not want the informant to "feed" Wise any information. "I want it to come from the target and/or myself during the interview."

Camarillo explained how the topic of the August 19, 2017 shooting was raised with Wise: After a short while when Wise in the cell with the informant, Camarillo pulled "Wise from the jail cell, interview[ed] him about my current investigation, and then place[d] him back in. [¶] So under this type of setting, it's not so much what they tell me. I'm more interested in what they go back in the cell and tell the undercover operative." Camarillo

---

[10] As we explain in section VII of the DISCUSSION, all the surrounding circumstances, including the details of the interrogation (*People v. Thompson* (1990) 50 Cal.3d 134, 166), must be taken into account in deciding whether the statements were voluntary. We stay as close as possible to the actual sequence and the words and expressions employed in the three encounters with the informants, even if this results in text that is clumsy and inartful. It is also important to note the free flow of the discussion, even though some of it is not directly relevant, because it shows the absence of pressure and compulsion.

[11] The original information charging appellants was filed on November 7, 2018.

referred to this as a "stimulation" to get the target to discuss the topic that the investigating officers want discussed.

Wise was placed in a cell with the confidential informant by the fictitious name of Stanley. [12]

The session commenced with one of the officers asking whether anybody wanted something to eat. When the informant declined, the officers asked whether anyone wanted juice. The informant said that would "work" and then told Wise that he looked young. The officer said that Wise could be taken to the medical clinic and asked again if Wise wanted something to drink, Wise said yes and the officer offered orange juice and asked if Wise was diabetic. It appears that at this point the officer left.

The conversation between Wise and the informant started with the informant asking where Wise was from. Wise replied that he was from 76 East Coast. A general conversation ensued during which the informant projected the image of a man who knew and understood the criminal justice system.

Camarillo entered and said that he worked with sheriff's homicide and that they were investigating a homicide that happened last August and that Wise's name had come up. He asked Wise and the informant to "hang tight" until his partner got there. Wise said he didn't know what Camarillo was talking about. Camarillo said that was alright "big guy" and closed by saying, "Thank you, sir, I appreciate it." Camarillo left.

The informant told Wise to use his brain and figure out that somebody was "telling." The informant cautioned Wise not to "go in there blind" and consider whether whoever he was with

_____

[12] This informant was paid $1,500 for his work.

9

was now in jail.  The informant described how somebody was telling and that he, the informant, was "trying to help you out." Wise said he didn't know what Camarillo was talking about. Wise described an attempt to rob him.

The informant went on for a while about going to court. Wise said he didn't know what the police were talking about but the informant told him that they "know something" and that they had evidence.  The informant now identified himself as an "OG," which means old gangster.

The informant pointed out that at the end of the day "they got you on a homicide."  Wise should "use [his] mind" and consider such things as self-defense.  Should Wise play the victim?

It was apparently at this point that Wise was taken out for the interview with Camarillo.

Upon his return to the cell, Wise said that the police were talking about a shooting.  Wise said they had showed him pictures of a car.  The informant told Wise that he had to "clear me up so I can help you" and that somebody was "telling on you."

Wise said that one of the cars was stolen and the other was "his," referring to Ray.  The informant again said that somebody was snitching and described how the snitch would talk.  The two men now talked about the man (Ray) with the car.

Wise identified Ray as the person with the car.  He said a female ("bitch") was in the front seat, she was Ray's girl, and she was in jail.

The informant asked if there were two of them in the backseat and asked what happened to Wise's "burner."  Wise said it jammed.  Wise said the other person was Godbolt ("Jaylin"). The female's name was Sierra.  The informant went into a tirade

10

about snitching.  Some conversation took place that is hard to follow but which led Wise to say:  "I was in the backseat."

The informant speculated about Godbolt's motivations in becoming a snitch.  The conversation turned to cars and then to a discussion of bail about which the two men appeared to disagree.

The balance of the recorded conversation contains nothing of note.

At some point during the recorded conversation, Camarillo removed Wise from the cell and subjected him to an interview that lasted 30 to 40 minutes.  Camarillo told Wise he had witnesses who identified Wise as seated in the rear passenger seat during the shooting on August 19, that they claimed that Wise was shooting out the window of the car, and who also identified Wise as being present at the shooting on August 8, 2017.  Neither statement was true and Wise denied both charges.

Camarillo testified that he learned a great deal from the conversation between Wise and the informant.  He learned that a stolen Honda was used in the shooting, that Wise was seated in the back passenger seat behind the driver, that a number of weapons were used, that Wise was unable to shoot with his gun because it wouldn't work, and that Ray and Godbolt were also present.

### 6.  *Godbolt's jailhouse statement*

Godbolt was questioned on January 12, 2018.  Camarillo used two undercover agents but otherwise used the same tactic of removing Godbolt at one point from the cell with the informants,[13] questioning him and then returning him to the cell.

---

[13] One of the two informants was the same one that had been used with Wise.

11

While being questioned by Camarillo, Godbolt was falsely told that his DNA had been found on the stolen car, which Godbolt denied.[14] Godbolt also denied any knowledge of gangs and that he had been in the car at the time of the shooting.

Godbolt's session extends to nearly one hundred pages in the transcript. It commenced with Godbolt asking whether he was getting an "add-charge interview," which was a question the deputy sheriff who was present could not answer. One of the two informants, however, said that it was going to be an add-charge interview. Godbolt then identified himself as an East Coast Crip and acknowledged that "they" were trying to give him a life sentence for some robberies. The informant advised Godbolt to listen to what the police had to say. When asked about his case, Godbolt said he was there for 22 robberies and a home invasion. The informant told Godbolt to stay strong.

The two men then talked for a while about a female.

The informant asked Godbolt whether he had been on probation and Godbolt answered that he was told that he would get probation. Both of the informants discussed the 22 robbery charges Godbolt was facing. Godbolt said he was in a single-man cell and the informant said that was the best way to be. The talk between the two informants and Godbolt turned to guns. Godbolt said they were charging him with a gang enhancement. The informant said they could not charge him with a gang enhancement.

_____

[14] Camarillo went so far as to show Godbolt a fictitious and false Department of Justice DNA report.

12

Godbolt said he was 19 and hoped to be out by the time he was 30. When Godbolt said that his state-appointed lawyer had come to see him three times, the informant said: "Hopefully, they throw you a sweet little deal." The two informants discussed that Godbolt had not been in jail before. The discussion turned to food.

Camarillo appeared and introduced himself. He said that, as soon as his partner arrived, he wanted to talk to Godbolt about a murder that happened last year in Compton. Godbolt said, "All right." Camarillo left.

The informants noted that it was "homicide." One of the informants said that somebody threw Godbolt's name under the bus. The informant said somebody was telling. Godbolt responded "this shit is crazy." Godbolt said one of his "homeys" got caught with a gun and that "this shit got me shaking." Godbolt wished they would hurry up and talk to him. The informant said: "So you can know what the fuck is going on." The informant said he was speaking from experience that someone was telling; Godbolt agreed. The informant advised Godbolt to listen. The informant repeated this advice.

A long and largely unintelligible conversation between the two informants followed during which Godbolt appears to have been in the interview with Camarillo.

Godbolt reappeared and one of the informants asked if he was all right. Godbolt said yes, he was "straight." The informant asked if they were snitching and Godbolt said yes; people were saying "my name is in it." Godbolt said he was told his DNA was found. The informant asked who had been shot and Godbolt said it was "Florence." The informant asked "do you got a feeling of which one is the bitch, which one is the snitch," and Godbolt said

13

yes. Godbolt said they had his DNA and had interviewed everybody but he wasn't telling them anything. The informant said, "You did right. Just listen."

Godbolt said they found no gun. The informant asked whose car it was. Godbolt said it was a stolen car. Godbolt said his "homey" went down for the stolen car and he knew the police questioned him first. The informant said that Godbolt's "crimie" was a "bitch" (referring to Ray), and Godbolt agreed.

Referring to the August 8 incident involving Ray, Godbolt reported that they asked him whether he was with Ray but he said he did not remember.

The informant asked Godbolt whether he was with Ray "when they did the shit in that other car." Godbolt said yes. (This may have been the first reference to the August 19 shootings.) The informant said, "Oh, my God." Godbolt said they did not get the gun because he got rid of it.

Godbolt said the murder was five months ago. He confirmed Ray was there also. Godbolt said: "All three—all four of us. The girl—the girl was with us in that car." The informant asked: "All four of you are up on in here?" Godbolt said yes.

Godbolt said they had been investigating the murder for six months and had "seen the stolen car . . . they see the stolen car hit the corner of the same block of this murder, so that's how they got the license plates, and they knew it was a stolen car."

The informant said you never know "which one is telling," and Godbolt said he knew who was telling. Godbolt said when people get caught for murder, they start naming. The informant said that they knew everybody who was there. Godbolt agreed. Godbolt said that the gun had been found in Ray's car.

14

The informant asked what kind of gun Godbolt was shooting.  Godbolt said it was a Glock 17 but he threw it away.  The informant asked how many people had gotten shot.  Godbolt replied that somebody died.  He went on to say: "I hit somebody for sure.  I hit somebody for sure that night."  The informant said, "Damn."  Godbolt said, "I think one person died."  The informant wanted to know if the police had asked about the gun.  Godbolt said that "all they got of me being in the car.  That's not good enough evidence.  I could have been in the car a day before that."

Godbolt now related what happened to Ray later on the day of the shooting, i.e., when he was arrested in possession of the stolen Honda and was found to be in possession of the gun that was determined to have been used in the shooting.  The informant suggested that Ray had asked for a deal, and Godbolt agreed.

The informant said if Godbolt ran into Ray, "you're going to fuck him up."  Godbolt said yes, and the informant said he would "beat the dog shit out of him."

The informant said that it was likely that Ray had told the police what everybody was shooting with.  Godbolt said that they had "ARs, revolvers, Glocks."  Godbolt said that "it was more than one gun shot when we all was in the car because we all had a burner . . . everybody had a pistol."  Godbolt volunteered the fact that Wise's gun jammed.

Godbolt said:  "The girl was driving.  That girl was driving.  Me and cuz, we were hanging out the window.  We all hanging out the window."

The balance of the recording contains nothing of note.

### 7. *Ray's jailhouse statement*

Ray was questioned on January 17, 2018. In the course of questioning outside the cell, Ray was told that the police had his DNA in a stolen car and that a witness had stated that he committed the shooting on August 8. These were lies. Neither statement was true. Ray was also shown a fake photo lineup with his photograph circled. Ray denied involvement in both the August 8 and August 19 shooting.

The session with the informant opened with the informant saying that "they can't just add-charge you, nigger,[15] for some bull. What you in here for?" After the informant told him he looked 17 years old, Ray said he was 18. Ray repeated that the upcoming interview could turn "into a add-charge," which had him "hot." The informant said he was in jail because of a gun.

Ray said he was there for a home invasion and they were trying to "give me life. I can't take it." Ray identified himself as being from 76 East Coast. The informant said he was from Chicago.

The informant told Ray that "they fucking you all up, n***. They fucking you all youngsters these days, my n***."

_____

**15** We exercise restraint in using this offensive term. However, inclusion of this term is necessary as it does illustrate and demonstrate the effectiveness of the informant in making himself appear to be close with the defendants. The informants use of this expression was intended to create an alliance—an "us-against-them" dynamic. Nevertheless, we shall insert *** where that word was used in the singular or plural tense in the balance of the opinion in order to delete literally what we understand can be viewed as offensive.

Camarillo entered at this point. He introduced himself and asked Ray if he knew that Camarillo and his partner were coming. Ray said he didn't know, and Camarillo explained that he was from homicide and needed to "chop it up with you about a couple of things" and that he would explain everything to Ray. Camarillo evidently then left the cell.

The informant told Ray that somebody was "doing this" since Ray had been in jail for three months and they were now coming to talk to him. Ray was in segregation ("K-4"). The informant said that "one of your n*** ain't solid." Ray: "I can't handle—I can't hold it. Fuck, I can't hold that. I can't handle that. N*** be fighting murders for five years. That's out." The informant asked Ray if his "n*** are silent," and Ray said no. The informant: "On a homicide?" Ray: "I don't fucking know." The informant told Ray he was young and that he hadn't "even seen life yet." Ray said he was being kept away from his n***.

The informant told Ray that they would "try to hit you young n*** upside the head, n***, blindside." Ray: "It got to be my crimie then." The informant said that "n*** ain't solid" and that the closest one to Ray would be the "first one to tell." Ray: "They cannot add charge. I pray to God. Please, God, please." The informant: "I'll tell you don't even talk to these motherfuckers." The informant advised Ray to talk to the police in order to find out what was going on.

Camarillo entered the cell and told Ray that they were waiting for an interview room and that the wait should not take long. Camarillo added: "Your name came up in a murder, so we'll see how it goes. Okay?" Ray: "All right." Camarillo left the cell.

The informant asked how Ray's name came up in a murder. Ray wondered how his name came up and went on to say that there would probably be add-charges. The informant told him to sit back and think about what the police would be talking about and that he better be using his brain.

The informant said that the police could have DNA and that it wasn't necessarily a person who put his name to a murder. On the other hand, the informant said, you never know that it could be someone who was throwing him under the bus to get a sweet deal. When asked with whom Ray has a beef, Ray said he "didn't beef." The informant said that when the police was acting like Camarillo, they had something. He asked Ray if anyone he knew got "laid down." Ray said no, he didn't want an add-charge. Ray was taken out of the cell for the interview with Camarillo.

Back in the cell, Ray told the informant that he was told they had his DNA and that he would be charged. The police said they had talked to people in jail and on the outside. But the police said that they couldn't tell him "stuff" if he didn't tell them "stuff." The police said Ray was the last person they talked to. The informant told Ray that the police knew a lot more than they were telling him.

Ray said the police had a lineup and they "circled my face." But the informant said that if the police didn't have it, they would not file on him. Ray agreed.

The informant asked if they had shown him pictures. Ray said they had shown the car driving away. The informant asked Ray if he was in the car but didn't wait for an answer. He went on to say that someone was telling on Ray. The informant said he was 44 years old and experienced and the police were trying to railroad Ray.

They then discussed that Ray was being kept away from his "crimie" and this meant that his crimie was telling on Ray.

The informant said that the police were trying to railroad him and somebody was telling on him.

The informant said that he was going to try and give Ray a scenario "to get to flip it around." He asked whether "they" were Mexicans.

The informant asked if the police had found the car. Ray said yes, "they got the car." The informant said, "Go with self-defense." Ray said the police had his DNA in the car. Every name the police had was in jail.

The informant criticized Ray for not wearing gloves. Ray said they were going to file because of the snitch but Ray did not say anything to the police. The informant said there were ways "you can go around it."

An officer came into the cell to get Ray's fingerprints. When Ray asked, the officer said that he was being charged with "187 P.C. murder."

The informant said that the man was snitching. That's why he was asking whom they were shooting. Ray said they were walking down the street and "didn't shoot back" because they "didn't have a chance." The informant told Ray he would "need to switch the story all the way up." The informant: "Listen, that's why I'm asking you how—how did it go down, my n***, so I could tell you how to switch it up." Ray: "We just pulled up on them and started smacking[16] on them and then drove off . . . they were on bikes. They was coming down the street and

---

[16] This means shooting.

19

they hit the corner, and we was going like this.  I busted a U-turn and, 'Boom,' got on them."

The informant now advised Ray what to do:  "This is what you do.  You all go to court with this shit.  Well, they filed on you.  You all go to court.  You already know it's the n*** telling on you.  So you think they're going to look at you different if you—you all switch on him?  You see what I'm saying?  N***, the is telling on you, period. [¶] Hold on.  N***, I'll switch it up.  I'll be like, 'N*** going down the street.  They get off.  I'm driving.  I tried to swerve.  The next thing you know, this dumb-ass n*** hanging out the window getting off.' [¶] You just said you was driving, right?  The n***—the n*** who is snitching, if he was smacking, obviously he wasn't driving, right?  Nine times out of ten, they ain't supposed to be looking at the driver for shooting, my n***.  If you're driving, but you got to look out where the fuck you're going, right? [¶] You didn't even know the n*** was about to get off.  You hit the corner.  Now this guy is tripping.  They get off.  You all getting—this n*** get off out there.  You ain't know the motherfucker is about to get off.  (INAUDIBLE.)  You all just need to sit down and get you all shit together because as of right now it's looking bad for you all, my n***.  You all need to us [*sic*] that shit as self-defense or something, but how are you going to get to this n*** that's a keep-away?"  The informant elaborated on this advice by adding that Ray should say that he was made to drive the car.

A colloquy followed about where Ray's confederate was.

The informant asked Ray whether he got rid of the gun.  Ray said he did not have it in his possession, it was in the car.

Nothing of note transpired during the remainder of this session.

### *8. Gang evidence*

The East Coast Crips is one of the largest African-American gangs in the country with around a thousand members. Florencia 13, a predominantly Hispanic gang, has around two thousand members and is the East Coast Crips worst enemy. The war between these two gangs is particularly bloody and is considered the biggest gang war in Los Angeles.

There is no dispute that all three appellants were active 76 East Coast Crips gang members.

Evidence was admitted that showed that Godbolt and Ray had committed robberies of other victims on July 20, 2017, and August 9, 2017.

## DISCUSSION

Appellants contend that their jailhouse statements should have been excluded because the statements were not voluntary and violated their constitutional rights protected by *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Respondent contends that the statements were voluntary and relies on *Perkins, supra*, 496 U.S. 292, to support its position. We begin with *Perkins* since it is basic to the three appeals before us.

## I. *Illinois v. Perkins*

Richard Stephenson was murdered in November 1984 in East St. Louis, Illinois. The murder remained unsolved until March 1986 when Lloyd Perkins related the details of Stephenson's murder to fellow inmate Donald Charlton at the Graham Correctional Facility. (*Perkins, supra*, 496 U.S. at p. 294.) Charlton told police about Perkins and Stephenson's murder but Perkins had been released by the time the police heard Charlton's account. However, the police were able to trace Perkins to a jail in Montgomery County in Illinois. The police

placed undercover agent John Parisi along with Charlton in the cell with Perkins with instructions to engage Perkins in conversation and report anything he might say about the Stephenson murder. (*Id.* at pp. 294–295.) In the course of a discussion between the three men in the jail cell about a possible breakout from the jail, Parisi asked Perkins if he had ever "done" anybody. Perkins then described in detail the Stephenson murder. Parisi did not give Perkins the *Miranda* warning before the conversation that led to the account of the murder. (*Id.* at p. 295.)

Perkins was charged with murder and before trial moved to suppress the statement made to Parisi. The trial court granted the motion and the Appellate Court of Illinois affirmed, holding that *Miranda* prohibits all undercover contact with incarcerated suspects that are reasonably likely to elicit an incriminating response. The United States Supreme Court granted certiorari and reversed. (*Perkins, supra*, 496 U.S. at pp. 295–296.)

The issue, as *Perkins* defined it, was whether "an undercover law enforcement officer must give *Miranda* warnings to an incarcerated suspect before asking him questions that may elicit an incriminating response." (*Perkins, supra*, 496 U.S. at pp. 295–296.)

In answering in the negative, the court focused on what "custodial interrogation" means under *Miranda*. In short, it means questioning initiated by law enforcement officers after a person has been taken into custody. (*Perkins, supra*, 496 U.S. at p. 296.) The court explained why questioning by cell mates is not the same as questioning by a police officer:

> "It is the premise of *Miranda* that the danger of
> coercion results from the interaction of custody and

22

official interrogation.  We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent.  Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will, but where a suspect does not know that he is conversing with a government agent, these pressures do not exist.  The state court here mistakenly assumed that because the suspect was in custody, no undercover questioning could take place.  When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners.

"*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." (*Perkins, supra*, 496 U.S. at p. 297.)

The court concluded that a law enforcement officer posing as a cellmate need not give *Miranda* warnings to an incarcerated suspect before asking questions that may elicit an incriminating response.  (*Perkins, supra*, 496 U.S. at p. 300.)

*Perkins* was not a departure from precedent nor was it a novel decision in any sense of that word, as the *Perkins* opinion itself makes clear.  The court noted that *Hoffa v. United States* (1966) 385 U.S. 293 held that placing an undercover agent near a suspect in order to gather incriminating information was

23

permissible under the Fifth Amendment.  Deception practiced by
that undercover agent did not affect the voluntariness of the
statement.  (*Perkins, supra,* 496 U.S. at p. 298.)  Nor was
*Massiah v. United States* (1964) 377 U.S. 201 implicated since, as
in the appeals at bar, no charges had been filed on the subjects of
the questioning.  (*Perkins,* at p. 299; see also *Arizona v. Mauro*
(1987) 481 U.S. 520, 521, 527 [conversation with spouse is not
interrogation under *Miranda*].)  In short, *Perkins* did not write on
a clean slate but rather affirmed the long-standing principle that
deceptive questioning in police investigation by an undercover
agent does not violate the Constitution.

## II.  THE TRIAL COURT'S RULINGS AND
## THE STANDARD OF REVIEW

The trial court denied defense motions to exclude the
jailhouse statements both at the preliminary hearing[17] and at a
hearing just prior to trial.  In the latter hearing, the trial court
ruled that the statements were not testimonial evidence, a
hearsay exception applied, and the statements were trustworthy
because they corroborated each other.  The court went on to state:
"And I think any issue of voluntariness or coercion or anything
like that really goes to the weight of the evidence rather than the
admissibility."

In reviewing appellant's contentions, "it is well established
that we accept the trial court's resolution of disputed facts and
inferences, and its evaluations of credibility, if supported by

---

[17] The motion to suppress the statements was brought
under the due process clauses of the state and federal
Constitutions and the Fifth and Sixth Amendments to the United
States Constitution.

24

substantial evidence.  We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." (*People v. Cunningham* (2001) 25 Cal.4th 926, 992.)

We will not disturb a ruling that is correct in law merely because the trial court gave the wrong reason.  (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19, citing *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329.)

## III.  A *MIRANDA* WARNING WAS NOT REQUIRED

Ray contends that the "*Perkins* operation was a sophisticated set-up calculated to undermine Ray's will and obtain a confession."  Ray lists a number of "background" facts and circumstances in support of this claim.[18]

We do not agree with the thrust of Ray's "background" facts that the statement that he made to the informant was the result

_____

[18] They are that he had been arraigned in October 2017 on numerous robbery charges; that he was 18 years old; that the informant with whom he spoke was a 44-year-old African-American man posing as a gang member who had been "through the system"; that the informant's "main psychological ploy" was to make Ray feel betrayed by convincing him that his accomplices had snitched on him; that Ray was laboring under the fear that he would be "add-charged"; that Ray felt threatened by Camarillo's statement that he was from the homicide bureau; that the pressure increased when Camarillo told him that they were investigating a homicide; that an officer was sent into the cell to get Ray's thumbprint who told him they were charging him with murder; that the informant aggressively questioned him about the shooting; and that Ray finally gave in to "relentless pressure" and confessed to the shootings.

of psychological coercion.  We set forth in sections VII and VIII why his statement was voluntary.

In this section, we confirm that the informant was not required to give Ray, Godbolt, or Wise the *Miranda* warning.

None of these facts and circumstances, some of which are strongly argumentative ("relentless pressure"), alter the fact that the incriminating statements that Ray made were made to an undercover informant and not to the police.  "The danger of coercion results from the interaction of custody and official interrogation."  (*Perkins, supra,* 46 U.S. at p. 297.)  None of the "background facts" detract from the fact that the statements were made not to the police but to an informant whose identity as a fellow inmate had been designed to win Ray's confidence, an objective which the informant was ultimately successful in achieving.

*Perkins* held that statements made to an undercover agent posing as a fellow inmate are not subject to *Miranda.*  The law on this is clear, even without *Perkins.*  California courts, including our Supreme Court, have held that there is no interrogation for *Miranda* purposes when there is no official police interrogation. (E.g., *People v. Gonzales & Soliz* (2011) 52 Cal.4th 254, 283 [no *Miranda* violation where defendant spoke to fellow inmate and gang member, who wore recording device, while both were being transported in sheriff's van]; *People v. Tate* (2010) 49 Cal.4th 635, 685–686 [no interrogation in case of possible accomplice/accessory]; *People v. Mayfield* (1997) 14 Cal.4th 668, 758 [father]; *People v. Williams* (1988) 44 Cal.3d 1127, 1141–1142 [*Miranda* "has never been applied to conversations between an inmate and an undercover agent"; coercive atmosphere of custodial police interrogation is absent]; *People v. Webb* (1993) 6

Cal.4th 494, 526 [no *Miranda* violation where defendant's girlfriend elicited incriminating statements during telephone conversations]; *People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1540 [no *Miranda* violation where defendant telephoned victim, who was acting as police agent, and made statements to her]; *People v. Jefferson* (2008) 158 Cal.App.4th 830, 840–841 [friend].)

The "background" facts do not detract from the principle that at no time was the informant required to give Ray the *Miranda* warning.

## IV. THE TRIAL COURT DID NOT FAIL TO RULE ON THE VOLUNTARINESS OF RAY'S STATEMENT

Ray contends that the trial court abdicated its duty to rule on the voluntariness of Ray's statement.

In denying the defense motions to exclude the jailhouse statements, the trial court stated, "I think any issue of voluntariness or coercion or anything like that really goes to the weight of the evidence rather than the admissibility."

The trial court twice denied defense motions to exclude the jailhouse statements. It would hardly have done so, had the court been of the opinion that the statements were involuntary. Thus, the denials of the motions to exclude the jailhouse statements subsumes the decision that the statements were voluntary, especially since the defense contention was that the statements were not voluntary. We conclude that the trial court's denial of the defense motions to exclude the jailhouse statements necessarily included a finding that the statements were voluntary. (*In re Ins. Installment Fee Cases* (2012) 211 Cal.App.4th 1395, 1429 [the meaning of a court order is a question of law within the ambit of the appellate court].)

27

It is also true, as respondent points out, that at another juncture, when appellants revisited the issue of the voluntariness of their statements to support their request for discovery of information about the informant, the trial court stated that it had listened to the recordings of the statements and "there doesn't sound to me to be any type of intimidation. It sounded, if I could characterize it, it was conversation."

A statement is either voluntary or involuntary. That voluntariness goes to the weight of the evidence is therefore wrong as an abstract proposition. However, in the context of the ruling denying the motions to exclude the statements (which necessarily meant that the statements were voluntary), what the court must have meant is that the statements were persuasive because they had been volunteered, i.e., they were to be accorded weight because they had been volunteered.

In any event, what is before us is the denial of the motion to exclude the jailhouse statements, not the reason(s) for the ruling. If one of the reasons for the ruling was in error, we will disregard that reason. (*D'Amico v. Board of Medical Examiners, supra,* 11 Cal.3d at p. 19.)

Without bothering to explain why this ruling was prejudicial error, Ray complains about the fact that the trial court excluded 13 pages of the transcript of the recording of his jailhouse statement.[19] Ray contends that the deleted pages show that the informant spoke to Ray for a long time before Ray confessed to the shooting, rather than Ray immediately confessing. The trial court deleted the pages in question because they contained material that incriminated Ray with other

_____

[19] The deleted pages are at clerk's transcript 986–999.

28

charges. That was reason enough to delete these pages. The court's ruling was a sound exercise of its discretion. (See *People v. Cox* (2003) 30 Cal.4th 916, 955.)

## V. RAY'S STATEMENTS TO THE INFORMANT DID NOT VIOLATE *MIRANDA*

At some point while being questioned by Camarillo, Ray said that if there were any more questions, the police should contact his attorney. Camarillo discontinued the questioning and returned Ray to the jail cell.

Ray contends that questioning by the informant after this was precluded by *Miranda* because the purpose of *Miranda* is to "act as a check against coercive police activity."

In *People v. Orozco* (2019) 32 Cal.App.5th 802, 806–807 (*Orozco*), baby Mia was left by her mother, Nathaly Martinez (Martinez), in the charge of Mia's father and Martinez's boyfriend, Edward Orozco. Thereafter, Mia died of blunt force trauma administered by Orozco. During Orozco's questioning by the police at the police station, Orozco attempted to provide a neutral explanation for Mia's death. Eventually, Orozco asked for a lawyer and the police interview was terminated. (*Orozco*, at pp. 807–808.)

Several hours later, Martinez and Orozco were placed by the police in an interview room and left to themselves. (*Orozco, supra,* 32 Cal.App.5th at p. 808.) Orozco initially gave Martinez the same neutral explanation he had given the police but, after a police officer entered the room to state that Mia had died at the hand of another, and after Martinez and Orozco had again been left in the interview room by themselves, Orozco ended up tearfully confessing to Martinez that he had killed Mia. (*Orozco*, at pp. 808–809.)

29

The court in *Orozco* concluded, after an extended analysis of *Perkins* and *Edwards v. Arizona* (1981) 451 U.S. 477, that "California courts have uniformly come to the conclusion that *Perkins* controls when a suspect invokes his *Miranda* right to counsel but later speaks with someone he does not know is an agent of the police. That was the holding of *Guilmette, supra,* 1 Cal.App.4th at pp. 1540–1541 and *Plyler* [(1993) 18 Cal.App.4th 535, 544–545]." (*Orozco, supra,* 32 Cal.App.5th at p. 815.)

Ray acknowledges *Orozco, Guilmette and Plyler* but goes on to contend that the "*Perkins* operation" in this case violated one of the main underpinnings of the *Miranda* warning—"to act as a check against coercive police activity." *Orozco* provides an apt answer to this contention:

> "Lastly, defendant argues that the police engaged in a 'persistent, underhanded attempt . . . to obtain a confession' by blatantly disregarding his repeated requests for counsel and then orchestrating a tearful confrontation with his girlfriend and the mother of his now-dead infant. The police conduct in this case was deplorable. [Citations.] But the question we must decide is whether it is *unconstitutional. Miranda* is not a free-floating bulwark against unfair police tactics. Constitutional rules are anchored to their rationales [citations], and *Miranda's* rule is moored to its purpose of 'preventing government officials from using the coercive nature of confinement to extract confessions.' [Citations.] '*Miranda* forbids coercion,' the Supreme Court has said, 'not mere strategic deception by taking advantage of a suspect's misplaced trust in one he

30

supposes to be' someone he can trust. (*Perkins, supra,* 496 U.S. at p. 297.) To construe *Miranda* to reach the noncoercive police conduct in this case is to untether *Miranda* from its purpose and, in so doing, undermine its legitimacy as one of the many bulwarks protecting the constitutional rights of criminal defendants. We decline to sully *Miranda* in this fashion." (*Orozco, supra,* 32 Cal.App.5th at pp. 816–817.)

The point is that *Miranda* is not applicable if the questions or comments that elicited a response were propounded by an undercover agent or by a person other than a police officer or police investigator. As *Orozco* put it, *Miranda* is not a "free floating bulwark against unfair police tactics," yet Ray would have *Miranda* serve "as a check against coercive police activity." *Miranda* precludes coercive custodial interrogation, not all "coercive police activity."

## VI. *PERKINS* DOES NOT ADDRESS, BUT ALSO DOES NOT PRECLUDE, INQUIRY INTO THE VOLUNTARINESS OF THE STATEMENT

Ray contends that a "close reading" of *Perkins* requires inquiries whether there were "compelling influences," whether the statement was given freely and voluntarily, whether police activity rose to the level of coercion, and whether the statement was freely given. We understand this argument to be that the court must continue to inquire into the voluntariness of incriminating statements made to undercover agents. That *Perkins* so holds is neither correct nor useful.

The rule that *Perkins* laid down is that an undercover agent of the police is not required to give the target suspect the *Miranda* warning.

The only effect of *Perkins* on the law governing the admission of confessions and admissions is that an undercover agent is not required to give the *Miranda* warning before engaging the target in a conversation that is designed to elicit a damaging statement.

*Perkins* does not affect a change in the jurisprudence of the voluntariness of confessions and admissions. If the undercover agent extracts a statement from the target by force or fear, the target is free to pursue his claim that the statement was not voluntary and, depending on the acts, may well prevail.

That is what happened in this case with the exception that the appellants did not prevail. The record in this case demonstrates that appellants contended vigorously in the trial court that their statements were not voluntary. Thus, counsel for Wise argued that Wise's statement was not voluntary, that it was the product of a coercive environment on the 18-year-old Wise, and that the undercover agent exerted undue and coercive pressure on Wise. Counsel also argued that Ray's and Godbolt's statements were the product of a coercive environment. Godbolt joined in Wise's argument. Counsel for Ray argued that "everything that the undercover [agent] said to Mr. Ray during his lengthy conversation amounted to coercion and compulsion." Counsel argued that "any type of coercion or compulsion renders a *Perkins* operation invalid." Counsel requested that the court exclude Ray's statement as the product of "involuntary police-dominated atmosphere." The written defense motion on this subject in which appellants joined claims that the undercover

agent "immediately begins his plan to coerce, compel, harass, intimidate and frighten" Ray and carries this theme forward through the entire motion.

The motions having been denied, the issue on appeal is whether appellants' statements were voluntary. We address this issue in the next section.

Ray claims that some courts have construed *Perkins* "as though it created a bright-line rule that any statement to an undercover government agent cannot be the product of coercive custody." We are not persuaded that this observation is correct about courts generally but, in any event, this court is not such a court. We think the only effect of *Perkins* on this case was that the undercover agent was not required to commence his discussions with appellants with *Miranda* warnings.

For the same reason, we reject Ray's claim that there is such a thing as an "undercover agent" exception to the *Miranda* rule that "enables the police to defraud a suspect into giving up his constitutional rights through calculated delays, tricks, disguises, and 'stimulation' tactics." There is no such exception. Appellants remained free to contend, as they did in the trail court and as they continue to do in this court, that their statements were not voluntary.

## VII. APPELLANTS' JAILHOUSE STATEMENTS WERE VOLUNTARY

### 1. General principles

"Any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion is inadmissible pursuant to the Fourteenth Amendment to the federal Constitution and article I, section 7 of the California Constitution." (*People v. Dykes* (2009) 46 Cal.4th 731, 752.) A

33

confession or statement is involuntary if it is not the product of a "rational intellect and a free will." (*Mincey v. Arizona* (1978) 437 U.S. 385, 398.) The test for determining whether a confession is voluntary is whether the questioned suspect's will was "overborne at the time he confessed." (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534.)

" 'The question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.' [Citations.] In determining whether or not an accused's will was overborne, 'an examination must be made of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' " (*People v. Thompson, supra,* 50 Cal.3d at p. 166.) "A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions." (*People v. Maury* (2003) 30 Cal4th 342, 404.)

In obtaining a statement, the use of deceptive tactics is not foreclosed. (*Orozco, supra,* 32 Cal.App.5th at pp. 319–320 [police trickery in placing defendant in room with someone he trusted to see if he would talk did not make a confession involuntary]; *People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280 [police trickery during an interrogation does not by itself make a confession involuntary or violate due process; subterfuge is not necessarily coercive in nature].)

### 2. *Common denominators*

Before examining each of the three statements made by appellants**,** we identify three common denominators found in these encounters.

34

One.  The informants in each of the three encounters were able to persuade each of the appellants that the informants were, even if not currently active, but at least former members of criminal street gangs.  This was materially furthered by the circumstance that at least one of the informants (there were two in Godbolt's case) was the same in at least two, if not possibly all three, encounters.  The assumption of the personae of a criminal street gang member allowed the informants to voice strong support, as they did, for the appellants in all three encounters.  In none of the three encounters did any one of the appellants voice skepticism about the projected personae of the informants.  That is, in all three encounters the appellants were persuaded that they were dealing with former, if not current, criminal gang members with substantial experience in the criminal justice system who were sympathetic to the appellants.

Two.  All three appellants contend on appeal that their statements were coerced through the application of psychological pressure.  "[C]oercion can be psychological as well as physical." (*People v. Ditson* (1962) 57 Cal.2d 415, 433.)  Psychological coercion often takes the form of implied threats (1 Witkin, Cal. Evidence (5th ed. 2020) Hearsay, § 69, p. 878), as it allegedly did in this case.  As an example, Godbolt argues that he was afraid of being "add-charged" with the consequences of the shootings.

The actual record of the encounters between appellants and the informants, in which appellants accepted the informants as sympathetic former or current criminal gang members, seriously undermines appellants' claim that the informants threatened them in any way.  The informants uniformly and successfully portrayed themselves as former gangsters who were sympathetic to appellants and who wanted to help the appellants.  We return

35

to this point in our discussion of each of the three encounters with the informants.

Three. In each of the three encounters the incriminating statements were made by the appellants well toward the end of the encounter. And the incriminating statements came in short bursts, often disconnected, and in conversation with the informants. This shows that it took some time for the informants in each instance to gain the confidence and trust of each of the appellants but, and this is the important point, in the end the informants did gain the appellants' trust and confidence. The reason the appellants made the incriminating statements that they ultimately made was that they believed that the informants could be of some help to them. In other words, the reasons for the statements were not the alleged threats but the informants' success in presenting themselves as helpful and knowledgeable criminal gang members.

### 3. *Wise's jailhouse statement was voluntary*

Wise contends that he "opened up to the [informant] only after the detectives performed on him a self-described 'stimulation' session designed to terrify him as being identified as a suspect in a murder investigation."

There is nothing in the record that supports the foregoing. To begin with, in his interview with Camarillo, Wise denied that he had been involved in the shooting. Even if he was "terrified," and there is nothing in the record that shows that he was, he certainly kept his wits about him. This means that the threat, if it was a threat, did not have an effect on Wise.

However, that Wise was a suspect in a murder investigation was not a threat, it was a reality. Cases that have invalidated confession because of the psychological pressure of

threats involve situations where the threatened harm is hypothetical. (E.g., *People v. Flores* (1983) 144 Cal.App.3d 459, 470, 471 [threat of death penalty followed by implied promise of more lenient treatment if defendant confessed]; *People v. Denney* (1984) 152 CalApp.3d 530, 544 [threat of gas chamber if defendant did not confess]; *In re J. Clyde K.* (1987) 192 Cal.App.3d 710, 720 [threat of jail].) There was nothing hypothetical about potential charges against Wise arising from the shootings. To say that Wise was facing charges arising from the shootings was to state a fact, not the blandishment of some future hypothetical harm.

It is also true that the due process clause required that Wise be advised of the charges against him.[20]

Wise contends that the informant took advantage of his relative youth by referring to himself as an "OG." Wise contends that this amounted to the "kind of influence a father can have over a son."

The context in which the informant stated he was an "OG" does not support Wise's contention.[21] The informant was trying to convince Wise that he, the informant, was experienced enough

---

[20] "Due process of law requires that an accused be advised of the charges against him in order that he may have a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial." (*In re Hess* (1955) 45 Cal.2d 171, 175.)

[21] "[The informant]: Listen, my n***. They [referring to the police] know you was there because one of the bitch-asses, (INAUDIBLE) my n***, I'm keeping it real. N***, I'm OG, homie. One of your n*** is a bitch. That's why—one of them n*** is a bitch. Now it's up to you to figure out which one is the hardest one."

37

to know when someone was acting as a snitch. The informant was not exerting any sort of pressure on Wise by referring to himself as an OG, he was touting the value of his advice that someone was snitching. In fact, the informant left it up to Wise to figure out who the informant was. This was not a father figure but rather an experienced gang member giving advice to a younger man. There was not a smidgeon of coercion in the informant's reference to himself as an "OG."

During the entire course of the exchange between Wise and the informant, the latter presented himself as a person who wanted to help Wise. There are at least two explicit statements by the informant that he wanted to help Wise. Throughout the entire exchange, the informant presented himself as someone who knew the criminal justice system and who was putting that knowledge to use in helping Wise.

There is not a single statement by the informant that could be characterized as designed to overcome Wise's "rational intellect and free will" (*Mincey v. Arizona, supra,* 437 U.S. at p. 398)—on the contrary, the informant urged Wise to "use his mind" to figure out how he could defend himself.

There is also nothing of record that would suggest that the police, including detective Camarillo, engaged in conduct that was coercive. On the contrary, the interview started with offers of food and drink by the police, and whenever Camarillo appeared, he was low key and even polite. What the entire course of the exchange between the informant and Wise reveals is that the informant had established himself as a trustworthy criminal veteran of the criminal justice system (trustworthy at least as far as a gang member like Wise was concerned) and that

he could be trusted with information about the problem that Wise was facing.

Wise's eventual acknowledgment of his participation in the shooting was a voluntary response to the informant's skillful portrayal of an old gang member who wanted to assist Wise in the situation in which Wise found himself.

### 4. *Godbolt's statement was voluntary*

Godbolt states he was aware of the fact that the police were considering an "add-charge." However, this appears to have made no impression on him for when one of two informants stated that Godbolt could be facing new charges, Godbolt responded by saying, "I ain't going to say shit." The additional charges arising out of the shooting were a reality[22] and not a threat of a hypothetical fact. In any event, Godbolt was not moved by it.

Godbolt ascribes evil motives to the informants. He contends that the informants urged him to sit through the police interview in order to expose him fully to the "stimulation" of that interview; that the informants kept suggesting that someone was snitching; that the informants' questioning led Godbolt to conclude that Ray was snitching; and that his DNA had been found in the vehicle.

Even if these accusations are treated as accurate and true, they do not amount to coercive conduct. None of these statements by the informants were made with the stated expectation that Godbolt would confess to any crimes. At most, these statements amount to bad advice. Be that as it may, we do

---

[22] Wise had placed Godbolt on the scene of the shooting.

not agree that the informants' statements were threatening, a subject to which we return below.

Godbolt contends that the "police used the tactics of false evidence and a manipulative, well-compensated informant to lead Godbolt down the path to a confession." Leading someone down the path to a confession is not the same as coercing a confession by impermissible threats. "[I]ntellectual persuasion is not the equivalent of coercion." (*People v. Ditson, supra,* 57 Cal.2d at p. 433.) If Godbolt contends that he was persuaded by false evidence and the informant, he may well be upset about that but persuasion does not amount to coercion.

Godbolt's characterization of the informants' statement as coercive is mistaken. As a review of the actual conversation between the informants and Godbolt shows, up to the time that Godbolt returned from the interview with Camarillo, the conversation was quite lengthy and meandered over various topics, some of which were neutral, such as Godbolt's current lawyer and the possibly "sweet deal" that Godbolt might expect to get. The informants certainly did not come across in that conversation as directive or hectoring. It was only upon Godbolt's return from the interview with Camarillo, that the talk turned to the shooting and then only in bits and pieces and in the course of the conversation with the informants. Until the very end, the informants held out as sympathetic listeners who thought that someone, very possibly Ray, was acting as an informant to Godbolt's detriment.

Godbolt's eventual incriminating statements made to the informants were voluntary responses to the conversation maintained by the informants.

40

### 5. *Ray's statement was voluntary*

Ray contends that his fear of being "add-charged" was used as a coercive tactic both by the police and the informant.

Wise had identified Ray as the person in the car from which the shots had been fired. There was therefore no doubt that Ray would be charged as a participant in the shooting. That there would be "add-charges" was therefore a fact and not a hypothetical threat that the police had no right to make. The due process clause required that Ray be advised of the charges against him. (*In re Hess, supra,* 45 Cal.2d at p. 175.)

It is perfectly understandable that Ray would be very concerned about being charged as a participant and/or actor in the shootings. As a participant in one homicide and four attempted murders, he had every reason to worry. The question is whether that concern translates into invalidating his confession made toward the end of this encounter with the informant.

The answer of course is no. A criminal actor's reasonable apprehension about the consequences of his misdeeds does not invalidate his confession.

Ray contends that the informant "pressured [Ray] to tell what happened and finally wore Ray down with his leading questions that fed Ray facts to affirm or correct." Ray's imaginative rendition of the informant's role omits to mention that the informant was trying to put together a story for Ray that would exonerate Ray.

Thus, the informant: "Listen, that's why I'm asking you how—how did it go down, my n***, so I could tell you how to switch it up." Now came Ray's fateful confession: "We just pulled up on them and started smacking on them and then drove off."

What the informant meant by "switch[ing] it up" was made immediately clear when the informant advised Ray, at some length to claim that he was only the driver of the car and that he had no idea that the others intended to shoot the people on the bicycles. In other words, the informant validated that his chosen role was to assist Ray.

Ray also claims that his confession was the result of the informant's "skilled cross-examination-type questioning." We do not agree that Ray confessed because the informant was a skilled questioner. Ray confessed because he trusted the informant to give him advice about how to deal with the charges Ray was facing. Be that as it may, effective cross-examination is not the same as impermissible psychological coercion sufficient to invalidate a confession.

Citing two out of state cases decided by intermediate appellate courts, Ray contends that Camarillo's reliance on false documents should invalidate Ray's ultimate confession made to the informant.

Resort by the police to deception is not a subject favored by reviewing courts. In one of two venerable cases on this subject that seem to have stood the test of time, the California Court of Appeal has deplored such tactics as morally unjustified and not commendable (*People v. Connelly* (1925) 195 Cal. 584, 597; see also *People v. Castello* (1924) 194 Cal. 595, 602) but nevertheless permissible as not invalidating an ensuing confession. We agree with *Connelly* and with Witkin who writes that cases in other jurisdictions holding fraudulently obtained confessions in admissible "usually involve something more than fraud." (1 Witkin, Cal. Evidence (5th ed. 2020) Hearsay, § 71, p. 879,

42

citing inter alia *Leyra v. Denno* (1954) 347 U.S. 556 and *Massiah v. United States, supra,* 377 U.S. 201.)

Ray confessed to the informant because he believed that the informant could help him if the informant knew the facts. Resort to deception by Camarillo, while not commendable in the abstract, did not invalidate the eventual confession since it is not likely to have led to an untrue statement (*In re Walker* (1974) 10 Cal.3d 764, 777) nor was it the proximate cause of the confession. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240 [misrepresentation not proximate cause of the confession].) Ray would not have confessed if he did not trust the informant. Camarillo's resort to false documents was not the proximate cause of the eventual confession made in conversation with the informant.

While Ray exhibited substantial apprehension about the charges he was facing which, as we have noted, was perfectly reasonable, the topics that dominated the conversation was who was snitching and how Ray should react to charges that he was involved in the shootings. On the latter subject, the informant clearly placed himself in Ray's camp, noting that the police were trying to railroad Ray. That the informant was there to help Ray was made clear when he told Ray before the latter's confession that he would advise Ray to "flip it around," an offer on which the informant certainly followed up, as we have noted.

As with Wise and Godbolt, Ray's eventual confession was the result of the informant's successful portrayal of a criminal gang member who was there to help Ray. It was a voluntary statement.

43

## VIII.  THE "STIMULATION" TACTIC
## WAS NOT A VIOLATION OF DUE PROCESS

Appellants contend that the due process clause was violated by the "coercive police activity" that produced the incriminating statements.  Each of the appellants claims that the "stimulation" tactic of interrupting the encounter with the informant by a police interview was impermissible and improper.

The procedure dubbed by Camarillo as a "stimulation" wherein he interrupted the encounters with the informant by police interrogation may or may not have been novel.  In any event, we find no prior recorded instance of this tactic in the cases.  The question is whether this "stimulation" tactic violated due process.

> "For all its consequence, 'due process' has never been, and perhaps can never be, precisely defined. '[Unlike] some legal rules,' this Court has said, due process 'is not a technical conception with a fixed content unrelated to time, place and circumstances.' *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895. Rather, the phrase expresses the requirement of 'fundamental fairness,' a requirement whose meaning can be as opaque as its importance is lofty.  Applying the Due Process Clause is therefore an uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake." (*Lassiter v. Department of Social Services of Durham County, N.C.* (1981) 452 U.S. 18, 24–25.)

Given that this particular tactic has not been the subject of an appellate opinion, we examine the interests involved.

The governmental interest, shared by the population at large, in the investigation of the criminal acts that occurred here is both clear and substantial.  The identification and apprehension of the person or persons who unleashed an indiscriminate fusillade of gunfire on a public street is an important objective, if only to prevent the recurrence of such a dangerous event.  Thus, the governmental interest in the investigation of such an event is entitled to be accorded substantial weight.

The suspects' interest is that their rights, both constitutional and statutory, remain protected and are not infringed.  We have discussed above the fact that the statements made by the appellants to the informants were voluntary.  It is also true that in each of the police interviews with the appellants they were accorded their rights under *Miranda* and chose not to make statements to the police.  Thus, the balance between the governmental interest in the investigation and the maintenance of appellants' rights favors the former since there was no violation of appellants' rights.

While appellants' claim that the "stimulation" tactic was coercive, there is nothing fundamentally unfair or coercive about the police interrupting a jailhouse conversation with an informant with a police interview.  Within reasonable parameters that were not violated here, the police are surely entitled to conduct suspect interviews at times selected by the police.  That the interruption worked out as the police thought it might does not render the interruption unfair or unconstitutional.

We are presented with an important governmental interest in the investigation of the instant crimes and with the fact that the appellants' rights were not violated.  Under these circumstances, we see no violation of due process.

We conclude that the "stimulation" tactic employed by Camarillo did not violate the state or federal Constitutions.

## IX.  THE INFORMANT DID NOT VIOLATE THE DUE PROCESS CLAUSE WHEN HE PORTRAYED RAY AS A SNITCH

Ray contends that the informant violated the due process clause when he portrayed Ray as a snitch to Godbolt and when he uttered threats against Ray.

This argument seems predicated on the unwarranted assumption that the informant was there to teach Sunday school.  Not so.  As we have pointed out, deceptive tactics are not foreclosed.  (*Orozco, supra,* 32 Cal.App.5th at pp. 319–320; *People v. Chutan, supra,* 72 Cal.App.4th at p. 1280.)  The informant's portrayal of Ray as a snitch was a deception.  If Ray's argument is that the process that he was due was nothing but the truth from the informant, the police may as well say farewell to informants and confidential agents.  It is unfortunately the very nature of undercover investigation that it is deceptive.  There is no law or constitutional provision that required the informant to be truthful and transparent.

That the informant egged Godbolt on to assault Ray is an exaggeration.  Once the informant was launched on describing Ray as a snitch, the informant necessarily had to maintain his bona fides as a gang member by voicing outrage that was appropriate in the case of snitches generally and Ray in particular.  In fact, as Ray acknowledges, the informant

46

eventually watered down the hard words about Ray by advising Godbolt to leave "these n*** alone" and "f-with them no more."

## X. APPELLANTS' STATEMENTS
## WERE NOT TESTIMONIAL

Appellants contends that their statements were testimonial and should therefore have been excluded.

*Crawford v. Washington* (2004) 541 U.S. 36, after tracing the history of the Sixth Amendment's confrontation clause [in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him] (541 U.S. at pp. 43–50), held that the clause applies to witnesses who testify against the accused, i.e. to " 'testimonial' statements." (541 U.S. at p. 51.) Finding that the confrontation clause applies not only to in-court testimony but also to out-of-court statements (541 U.S. at pp. 49–50), the court described various types of "testimonial" statements:  " '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially' [citations] . . . '[s]tatements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " (541 U.S. at pp. 51–52.)  The court concluded that "statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." (541 U.S. at p. 52.)

Given this background, the United States Supreme Court has held that statements made unwittingly to a government informant are not testimonial.  (*Davis v. Washington* (2006) 547 U.S. 813, 825, citing *Bourjaily v. United States* (1987) 483 U.S.

171, 181–184.) This makes sense since, in the usual setting of such communications, there is no expectation whatever by the declarant that the statement would be used at trial.

California has followed the federal lead. In *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1399, the defendant was placed in a cell next to a paid confidential informant, as in this case. The conversation between the defendant and the informant was surreptitiously recorded. The defendant's incriminating statement was admitted into evidence. The court held the defendant's statement to be nontestimonial. (*Id.* at pp. 1401–1402.) The court explained:

> "Federal courts have repeatedly held that statements unwittingly made to an informant are not 'testimonial' for confrontation clause purposes. (*U.S. v. Tolliver* (7th Cir.2006) 454 F.3d 660, 665; *U.S. v. Underwood* (11th Cir.2006) 446 F.3d 1340, 1347–1348; *U.S. v. Hendricks* (3d Cir.2005) 395 F.3d 173, 182–184; *U.S. v. Saget* (2d Cir.2004) 377 F.3d 223, 229–230; *U.S. v. Smalls* (10th Cir.2010) 605 F.3d 765, 778 [prisoner's recorded statement to a fellow prisoner who was actually a government informant is 'unquestionably nontestimonial'].) We agree with the rule and rationale of these cases. We hold that statements unwittingly made to an informant are not 'testimonial' within the meaning of the confrontation clause. The last thing [defendant] expected was for his statement to be repeated in court." (*People v. Arauz, supra,* 210 Cal.App.4th at p. 1402.)

Nontestimonial evidence is subject only to the traditional limitations upon hearsay evidence and does not implicate the Sixth Amendment right of confrontation. (*People v. Arauz, supra,* 210 Cal.App.4th at pp. 1401–1402.) Reviewing courts have followed *Arauz.* (*People v. Gallardo* (2017) 18 Cal.App.5th 51, 67–68; see *People v. Almeda* (2018) 19 Cal.App.5th 346, 362–363.)

Ray contends that *Arauz* and *Gallardo* were wrongly decided because these decisions give insufficient weight to facts showing that the primary purpose of the conversations with the informants was to create an out-of-court substitute for trial testimony. While it is true that the United States Supreme Court has held that one must look to statements and actions of both the declarant and the interrogator (*Michigan v. Bryant* (2011) 562 U.S. 344, 367–368), we do not think that this case provides the necessary factual predicate for Ray's contention.

In this case, it is clear that Camarillo was acting as an investigator of the homicide. As Camarillo testified, before he interrogated Wise, he had "no idea if Branden Wise was involved in my current murder investigation. I had no information indicating that he was involved in that investigation. . . . So I used the *Perkins* operation to see if I was on the right track or possibly lead me in the right direction." Thus, as the "*Perkins* operation" got under way, the case was not at the stage where the police had any reason to think that they were even near to obtaining incriminating statements for trial purposes. While Ray's argument makes an interesting point in the abstract, there are no facts in this case that support it. The diffuse, wide-ranging and free-flowing conversations between the informants and the appellants were not the equivalents of police interrogation. Certainly, it could be said of this case, as it was

49

said in *Arauz*, that the last thing appellants expected was for their statements to be repeated in court.

We conclude that appellants' statements were not testimonial.

## XI.  APPELLANTS' STATEMENTS WERE DECLARATIONS AGAINST PENAL INTEREST

Appellants contend that their statements were not against their penal interest.

Statements that are otherwise hearsay that can subject the declarant to criminal liability are admissible as declarations against interest. (Evid. Code, § 1230; *People v. Samuels* (2005) 36 Cal.4th 96, 120.)  The trial court's ruling admitting such a statement is reviewed for abuse of discretion.  (*People v. Lawley* (2002) 27 Cal.4th 102, 153.)

Appellants claim that their declarations were not against their penal interests because their statements were made to impress the informant who identified himself as a person with connections and influence in the Black gang structure in and outside of jail.[23]

The flaw in this argument is that appellants' convictions for murder and attempted murder rest largely on their confessions and admissions.  It is difficult to see how the jury could have convicted them without those statements.  Thus, Wise admitted that he tried to shoot but the gun jammed, Godbolt said he hit somebody for sure, and Ray stated that they were shooting.

---

[23] Interestingly, Ray writes that the informant "made it clear to these teenagers that he was in a position to advise and help them."  That is certainly true but it runs counter to appellants' earlier argument that the informant was there to threaten them.

These confessions were central to their convictions and thus were certainly against their penal interest. The jury obviously did not interpret appellants' statements to the informant as nothing but idle boasting.

Appellants contend that some of their statements were not against their penal interests in that they implicated others and not the declarant. Appellants seek to invoke the rule that a hearsay statement that is in part inculpatory and in part exculpatory is not admissible under this hearsay exception. (*People v. Duarte* (2000) 24 Cal.4th 603, 612.)

Ray contends that these statements were not inculpatory: Wise's statement that Ray was driving the stolen car; that Sierra was seated in the front seat; and that Ray and Godbolt were the shooters did not implicate Wise; Godbolt's statement that Ray was the "main one"; that Ray was arrested for the stolen Honda; and the guns used by Ray and Wise were in the stolen Honda when Ray was arrested did not implicate Godbolt.

Godbolt contends that Wise's statement that Godbolt was the shooter and had a .9-millimeter gun were not against Wise's penal interest.

Wise claims that Godbolt's statement that there were four people in the car and that Wise did not shoot because the gun did not work was not against Godbolt's penal interest.

We do not agree with the claim that appellants' statements were exculpatory. Each of the statements claimed to be exculpatory were inculpatory in that they showed that the person making the statement was present on the scene of the shooting. That is certainly inculpatory. That is also true of the statement that the Honda was a stolen car since it showed knowledge about the car that was used in the shootings.

51

Ultimately, each of the appellants acknowledged in some way their participation in the shootings and none of them tried to shift responsibility to another. While Godbolt referred to Ray as the "main one," he acknowledged, among other things, that he shot at least one person. That Ray was looked upon as the principal in the shooting shows that Godbolt had first-hand knowledge of the shooting.

The trial court's ruling admitting the statements as declarations against penal interest was correct; there was no abuse of discretion.

## XII.  THE COURT WAS NOT REQUIRED TO GIVE THE ACCOMPLICE INSTRUCTION

Appellants contend that the accomplice instruction (CALCRIM No. 334) should have been given. The instruction that the appellants claim should have been given is that "[a]ny statement of an accomplice that tends to incriminate the defendant should be viewed with caution."

It is settled that the accomplice instruction need not be given if the defendant's statements are found to be against the defendant's penal interest. (*People v. Brown* (2003) 31 Cal.4th 518, 555–556.) This is so because the usual problem with accomplice testimony, that it is not reliable, "is not present in an out-of-court statement that is *itself sufficiently reliable* to be allowed in evidence." (*People v. Brown, supra,* 31 Cal.4th at p. 555.) To the same effect are *People v. Gallardo, supra,* 18 Cal.App.5th at page 81, and *People v. Jefferey* (1995) 37 Cal.App.4th 209, 218.

Appellants contend that the foregoing principle does not apply because their statements made to the informants "were not trustworthy or made under sufficiently reliable circumstances."

52

They contend that their memories were no longer fresh, they had admitted to smoking marijuana at the time of the shooting and had been in jail for months and wanted to go home.

The statements made by the appellants to the informants were remarkably consistent when it came to relating the circumstances of the shooting. This is certainly an indication of the reliability of the statements and negates the suggestion that their memories were no longer fresh. And we agree with respondent that there is evidence that corroborates the statements in the form of the handgun recovered from Ray that was used in the shooting. There is also the overarching fact that the statements were, as we have noted, declarations against penal interests. This lends the statements credibility.

The court made the right decision in refusing to give the accomplice instruction.

### XIII. APPELLANTS' CONVICTION OF THE ATTEMTED MURDER OF JIMENEZ MUST BE REVERSED

Appellants contend that their conviction for the attempted murder of Manuel Jimenez should be reversed because it is not supported by substantial evidence.

It is not disputed that the five people who were the victims of the shooting were riding on four bicycles. Two of them, Orozco and Ramirez, were on one bike that was in the lead. According to Gastelo, they were followed by Jimenez, then Alvarez, and finally Gastelo. However, according to Alvarez, Jimenez was behind Gastelo.

Gastelo, Alvarez, and Orozco were able to describe the course of the shooting in which they were clearly targets of the

53

shooters.  Gastelo and Orozco described the injuries they sustained.

Other than the fact that Jimenez was part of the group of five and riding a bicycle, the only thing we know about Jimenez is that he ran off on foot after the shooting started.  We are not even sure whether he was ahead or behind Gastelo.

Jimenez was never located by the police and therefore he was never interviewed.  We simply don't know how the shooting affected him.

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing."  (*People v. Ervine* (2009) 47 Cal.4th 745, 785.)  Ray contends that there was no evidence that Jimenez was intentionally fired upon.  That is, there is nothing to show that the shooters had the specific intent to kill Jimenez.

While we have no problem with that issue when it comes to Gastelo, Alvarez, and Orozco, there is literally no evidence that Jimenez was a target of the shooters.  That Jimenez ran off on foot does not mean that he was a specific target of any of the shooters.  Given that a lot of bullets were flying, any sensible person would have run off if he could, even if no one was shooting at him.

Respondent contends that the testimony of Alvarez and Orozco that the shooters were firing on the group of riders, including Jimenez, was sufficient to show "that appellants fired at Jimenez."  While there may be other crimes that were committed simply by firing at the group as a whole, attempted murder is a specific intent offense.  There is literally no evidence showing that Jimenez was at any time a target of the shooters.  "When a specific intent is an element of the offense it presents a

54

question of fact which must be proved like any other fact in the case." (*People v. Maciel* (1925) 71 Cal.App. 213, 218.)  Absent any evidence on the fact of appellants' specific intent to murder Jimenez,[24] we must reverse the convictions for the attempted murder of Jimenez.

## XIV.  WE DECLINE TO REMAND TO DETERMINE THE ABILITY TO PAY FINES AND FEES

The trial court imposed fines and fees on appellants which we enumerate below.  All three appellants requested that the court find that they did not have the ability to pay these fines and fees.  In ruling on this request, the court stated:  "I'm not going to find an inability to pay."

Even though the ruling is somewhat ambiguous, the trial court's ruling can be interpreted as a finding that appellants have the ability to pay these fines and fees.  The ruling can also be interpreted to mean that the court declined to rule on appellants' request.  However, the better view is that the court ruled that appellants have the ability to pay.  We explain below why we decline to remand the cases for a hearing on the ability to pay.

---

[24] Specific intent is usually proved by circumstantial evidence.  (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.)  The circumstance that Gastelo and Orozco were shot several times is evidence of specific intent.  Alvarez testified that the people in the car were shooting at her.

1. ***The fines and fees imposed; the error in Godbolt's court security fee and criminal conviction assessment***
<u>Godbolt</u>

The court imposed a $300 restitution fine under Penal Code section 1202.4, a $1,360 court security fee under Penal Code section 1465.8, and a $1,020 criminal conviction assessment under Government Code section 70373.

Respondent concedes that Godbolt was convicted of 31, and not 34, felonies and that the assessments under Government Code section 70373 and Penal Code section 1465.8 should respectively be reduced to $930 and $1,240.

<u>Ray</u>

The court imposed a $300 restitution fine (Pen. Code, § 1202.4), a court security fee of $1,440 (Pen. Code, § 1465.8), a criminal conviction assessment of $1,080 (Gov. Code, § 70373), and a theft crime fee of $41 (Pen. Code, § 1202.5).

<u>Wise</u>

The court imposed a court security fee of $1,360, a criminal conviction assessment of $1,020, and a theft crime fee of $41.

The court deferred ruling on restitution.

2. ***We decline to remand the cases for a determination of ability to pay***

We note that our Supreme Court has granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, to consider whether a trial court must consider a defendant's ability to pay and, if so, which party bears the burden of proof regarding defendant's inability to pay.

Appellants contend that the order on fees and fines should be reversed because they were imposed without a determination

56

of appellants' ability to pay. Appellants rely on *People v. Dueñas* (2019) 30 Cal.App.5th 1157.

We think the trial court's ruling was that appellants had the ability to pay. This was an entirely reasonable ruling in that the restitution fines imposed were minimal, as were the balance of the fees and fines imposed.

It is true that there was no hearing on the ability to pay. There was solely the court's ambiguous ruling that we have interpreted as a finding that appellants have the ability to pay. However, it does not follow that remanding the cases for a hearing on the ability to pay would serve any useful purpose at this point. The issues whether a trial court must consider a defendant's ability to pay and, if so, which party bears the burden of proof regarding defendant's inability to pay are before our Supreme Court. Until these issues have been authoritatively laid to rest, a hearing on these issues would serve no purpose. Accordingly, we leave it to future postjudgment proceedings whether appellants should have a hearing on their ability to pay. In light of the minimal nature of the fees and fines imposed, appellants are not going to be prejudiced by waiting for our Supreme Court to decide *People v. Kopp, supra,* 38 Cal.App.5th 47, rev.gr.

## XV. WE AFFIRM THE ORDER DENYNG THE REQUEST FOR INFORMATION ABOUT THE INFORMANT

Wise filed a motion in which he requested disclosure of information about the informant. Ray and Godbolt joined in the motion. The request was for tattoos, the informant's criminal record, if any, the contract between the police and the informant and the informant's history as an informant.

After holding two in camera hearings with detective Camarillo, the trial court denied the entire request. The court found that disclosure of the requested information would endanger the life of the informant. Appellants have requested that we independently review the court's order.

We have done so. We find the trial court's order is based on substantial evidence and was a sound exercise of its discretion. We affirm the order.

## DISPOSITION

Appellants' convictions for the attempted murder of Manuel Jose Jimenez are reversed. Appellants' cases are remanded with directions to enter new sentences that reflect the reversal of the convictions for the attempted murder of Manuel Jose Jimenez. In the instance of each appellant, the sentence is to be reduced by a term of 15 years to life imprisonment.

The judgment as to Godbolt is to be corrected to provide for a court security fee of $930 under Penal Code section 1465.8 and a criminal conviction assessment of $1,240 under Government Code section 70373.

The superior court is directed to correct the following errors in the abstracts of judgment: (1) In Godbolt's abstract, the number of determinate years is to be reduced from 252 to 250 (abstract, p. 1, para. 6) and is to be further reduced by 15 years to reflect the reversal of the judgment for the attempted murder of Manuel Jose Jimenez; (2) in Godbolt's abstract, in all but the 25 robbery counts, the convictions must be shown to be based on convictions by a jury instead of being based on pleas; (3) in Ray's abstract, in all but the 28 robbery counts, the convictions must be shown to be based on convictions by a jury instead of being based on pleas.

The superior court shall issue new abstracts of judgment that correct the errors noted and that reflect the new sentences imposed on appellants.  The court shall forward the new abstracts of judgment to the Department of Corrections and Rehabilitation.

In all other respects, the judgments are affirmed.
**NOT TO BE PUBLISHED.**


LUI, P. J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.

Court of Appeal, Second Appellate District, Division Two - No. B302235

**S268148**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

_____

THE PEOPLE, Plaintiff and Respondent,

v.

JAYLIN GODBOLT et al., Defendants and Appellants.

_____

The petitions for review are denied without prejudice to any relief to which defendant might be entitled after this court decides *People v. Kopp*, S257844.

Liu and Cuéllar, JJ., are of the opinion the petition should be granted.

Cantil-Sakauye
*Chief Justice*

PEOPLE v. GODBOLT

S268148


Dissenting Statement by Justice Liu


As the high court explained in *Miranda v. Arizona* (1966) 384 U.S. 436, the Fifth Amendment to the United States Constitution requires that "custodial interrogation be preceded by advice to the putative defendant that he [or she] has the right to remain silent and also the right to the presence of an attorney." (*Edwards v. Arizona* (1981) 451 U.S. 477, 481–482, citing *Miranda*, at p. 479.) If the accused requests counsel, he or she "is not subject to further interrogation by the authorities until counsel has been made available" (*Edwards*, at pp. 484–485) unless the accused initiates further contact with the police or "experience[s] a break in *Miranda* custody lasting" at least two weeks (*Maryland v. Shatzer* (2010) 559 U.S. 98, 117).

"As it turns out, however, courts have understood this clear procedure to contain a caveat: Although a suspect's invocation of the right to silence or right to counsel cuts off questioning by the police in uniform, it does not stop the police from going undercover to continue questioning the suspect until he confesses." (*People v. De Jesus Valencia* (Aug. 5, 2019, B283588) [nonpub. opn.] review den. Dec. 11, 2019, S258038 (dis. stmt. of Liu, J.) (*De Jesus Valencia*).) Although "I suspect most Americans do not know and would not expect that the police may continue to question a person who remains in custody after invoking *Miranda* rights so long as the questioning occurs through trickery or deceit," it appears that this police practice has become "common . . . throughout California." (*Ibid.*)

1

The Courts of Appeal, including the appellate court here, have upheld this practice on the authority of *Illinois v. Perkins* (1990) 496 U.S. 292. (See, e.g., *People v. Orozco* (2019) 32 Cal.App.5th 802, 812–817.) But *Perkins* did not address undercover questioning of a defendant who had invoked his right to counsel or right to silence (*Perkins*, at pp. 300–301, fn. * (conc. opn. of Brennan, J.)), and at least one state high court has determined that absent proof of waiver, statements made to jailhouse informants following the invocation of the right to counsel are not admissible. (*Boehm v. State* (Nev. 1997) 944 P.2d 269, 271; see also *U.S. v. Holness* (4th Cir. 2013) 706 F.3d 579, 593–598.) I also "find dubious the claim that it is lawful for the police to continue questioning a suspect who has invoked *Miranda* rights and remains in custody so long as the police disguise the interrogation." (*De Jesus Valencia, supra,* B283588 (dis. stmt. of Liu, J.).) Accordingly, I would grant review to determine the legality of this tactic.

Because "this court has declined several opportunities to address the issue," I again call on "the Legislature to examine whether additional safeguards are necessary to restore *Miranda*'s core purpose of ensuring that any statement made by a suspect to the police is 'truly . . . the product of his [or her] free choice.'" (*De Jesus Valencia, supra,* B283588 (dis. stmt. of Liu, J.).) "The Legislature could require police departments and prosecutors' offices [to] prohibit surreptitious questioning after a suspect has invoked *Miranda* rights." (*Ibid.*) "Other reform options include: directing the Office of the Attorney General to publish model guidelines . . . that forbid post-invocation surreptitious questioning; prohibiting surreptitious questioning for a specified period of time after a *Miranda* invocation or until there has been a significant break in custody; requiring any

post-invocation, police-initiated questioning of a suspect to be preceded by fresh *Miranda* warnings; requiring any post-invocation, police-directed questioning to be preceded by a disclosure to the suspect that the questioning is in fact police-directed; and imposing civil liability on police officers and departments for surreptitiously questioning a suspect after he [or she] has invoked *Miranda* rights." (*Ibid.*) Strict adherence to *Miranda* in undercover or informant operations would not prevent police from waiting for suspects to change their minds and initiate conversation, or from investigating a crime by other avenues. (See *Minnick v. Mississippi* (1990) 498 U.S. 146, 155; cf. *Maryland v. Shatzer*, *supra*, 559 U.S. at pp. 112–114; *Rhode Island v. Innis* (1980) 446 U.S. 291, 300–302.)

The *Miranda* warning "has become . . . part of our national culture" (*Dickerson v. United States* (2000) 530 U.S. 428, 443), and "[t]he right to cut off questioning and seek assistance of counsel is deeply embedded in the consciousness of our citizenry as a fundamental protection against the formidable power of the police" (*De Jesus Valencia*, *supra*, B283588 (dis. stmt. of Liu, J.)). "It trivializes this protection to say it can be defeated by a simple ruse." (*Ibid.*) The time remains "ripe for the Legislature to address this issue in light of this court's reluctance to intervene." (*Ibid.*)

**LIU, J.**

**I Concur:**
**CUÉLLAR, J.**

3